**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

RICHARD DASCHBACH and ELCINDA
PERSON, individually and on behalf of all
others similarly situated,

                  *Plaintiffs,*

    v.

PMC HOME & AUTO INSURANCE
AGENCY, LLC d/b/a PROTECT MY CAR
a Florida limited liability company,

                  *Defendant.*

Case No. 1:20-cv-00706-JL

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND TO DISMISS COMPLAINT, OR, ALTERNATIVELY,
<u>TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION</u>**

This case challenges Defendant PMC Home & Auto Insurance Agency, LLC

d/b/a Protect My Car's ("Defendant" or "PMC") serial violations of the Telephone Consumer

Protection Act ("TCPA"). Specifically, PMC—on its own or through an agent acting on its

behalf—bombards consumers' cell phones with unsolicited, autodialed phone calls and text

messages without obtaining prior express consent. In response to Plaintiffs' complaint, PMC

asks the Court to compel arbitration of both Plaintiffs' claims, or, in the alternative, to dismiss

the case for lack of jurisdiction. Fortunately for Plaintiffs and the members of the alleged

Classes, neither arbitration agreement is enforceable here, and dismissal for lack of jurisdiction is

not warranted. As such, and as explained further below, the Court should deny PMC's Motion in

its entirety.

Defendant's motion to compel arbitration is premised on the existence of an agreement to

arbitrate Plaintiffs' claims. As for Plaintiff Daschbach, Defendant contends he visited a website

called signup.finddreamjobs.com in April 2019, provided consent to be called by PMC, and

agreed to an arbitration agreement in the process. (*See* Dkt. 12-3.) Likewise, Defendant contends that Plaintiff Person visited the website www.retailproductzone.com in March 2019, provided consent, and agreed to arbitrate any disputes. (Dkt. 12-2.) However, both supposed "agreements" proffered by PMC are unenforceable here for two main reasons. First, both Plaintiffs unequivocally deny visiting these websites and entering their information. Second, the declaration and website screenshots provided by PMC are insufficient to demonstrate that Plaintiffs were notified of or assented to the terms and conditions, including the arbitration clause. In fact, they reveal that both websites were insufficient to support an agreement with any similarly-situated class member even if someone had in fact visited the websites (which again, Plaintiffs deny doing).

Defendant's alternative motion to dismiss for lack of jurisdiction is also flawed. As explained below, the Court has specific jurisdiction in this case and the Supreme Court's *Bristol-Myers* decision is inapposite. Accordingly, the Court should deny Defendant's Motion in its entirety.

## II.     FACTUAL BACKGROUND

On May 13, 2019, Plaintiff Richard Daschbach received an unsolicited autodialed call from PMC on his cellphone. (Compl., Dkt. 1, at ¶ 17.) The purpose of the call was to solicit Daschbach to purchase one of PMC's extended auto warranties (*Id.* at ¶ 19.) Defendant claims Daschbach went to a website called signup.finddreamjobs.com in April 2019, provided consent to be called by PMC, and agreed to an arbitration agreement in the process. (*See* Dkt. 12-3.) Daschbach denies ever visiting this website or authorizing another person to do so on his behalf. (*See* "Declaration of Richard Daschbach," attached hereto as Ex. A.) Daschbach graduated from Georgetown Law School in 1962, has been a member of the District of Columbia Bar since

1966, and until 2014 served as the Chief Judge of the Federal Employees' Compensation Appeals Board. (*See id.*) Thus, not only does Daschbach deny ever visiting the website signup.finddreamjobs.com, he is not in the market for a job and had no reason not visit the website PMC contends that he did. (*Id.*)

As for Plaintiff Person, he received a text message in May 2019 from PMC to his cellular telephone. (Dkt. 1, ¶ 25.) The text solicited Person to purchase an extended auto warranty and directed Person to visit the website protectmycar.com/getfreequote. (Dkt. 1, ¶ 27.) Defendant claims Daschbach went to a website called www.retailproductzone.com in March 2019, provided consent to be called by PMC, and agreed to an arbitration agreement. (*See* Dkt. 12-2.) Similar to Daschbach, Person denies ever visiting this website or authorizing another person to do so on his behalf. (*See* "Declaration of Elcinda Person," attached hereto as Ex. B.) Not only did he not visit this particular website, Person states that he rarely uses the internet whatsoever. (*Id.* at ¶ 6.) Moreover, Person states that he only owns one internet connective device (his cellphone) and never uses his cellphone to access the internet. (*Id.* at ¶ 7.)

## III.   ARGUMENT

### A.   Plaintiffs TCPA Claims Are Not Subject To Any Agreement To Arbitrate

As stated above, Defendant relies on the existence of a supposedly valid and enforceable agreement between PMC and Plaintiffs. Defendant has submitted two declarations from a Fluent Computer System Engineer named Mitenkumar Bhadania in an attempt to evince such agreements. However, the provisions and screenshots included in the Declarations do quite the opposite.

In general, the Federal Arbitration Act ("FAA") embodies "the basic precept that arbitration 'is a matter of consent, not coercion.'" *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

559 U.S. 662, 681 (2010)). Arbitration is a matter of contract, but because the FAA leaves courts with little discretion to preside over matters covered by a valid agreement to arbitrate, "[t]he court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (emphasis in original). PMC's alleged "agreements" fail because, as explained below, Defendant cannot adequately demonstrate assent by Plaintiffs or the class members.

> 1.    **PMC did not adequately notify or obtain assent from Plaintiffs or the class members to support enforcement of its website terms, including the clause mandating arbitration.**

Defendant is eager to compel both Daschbach and Person to arbitrate their claims, but it cannot do so in the absence of a valid agreement to arbitrate. Determining whether the parties actually entered into an enforceable agreement is one of the Court's important roles in considering whether to compel arbitration. *See Chiron*, 207 F.3d at 1130. Even in the context of internet commerce, the basic principles of contract law remain the same: a mutual manifestation of assent "is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

In general, internet contracts fall into one of two categories: clickwrap agreements, when users are required to click on an "I Agree" box after being presented with terms and conditions; and browsewrap agreements, when terms and conditions are posted via hyperlink at the bottom of a webpage. *Nguyen*, 763 F.3d at 1175–76. In some cases, websites present a hybrid of these two categories (often referred to as "hybridwrap") by including a link to terms and conditions,

often near a button that users must click to continue. In *Nguyen*, the Ninth Circuit considered a hybridwrap agreement, to which it applied browsewrap principles:

> Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website.
> . . .
> But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract. Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage.

*Nguyen*, 763 F.3d at 1176–77 (citations omitted). The Court went on to note that, though the "Terms of Use" link was presented near a button that the user needed to click to proceed with checkout, "the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice." *Id.* at 1178. The Barnes and Noble arbitration agreement otherwise failed to admonish website users to actually *review* the terms of use before proceeding. *Id.* Ultimately, the Ninth Circuit held that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* at 1178–79. Due to the range of technological savvy of internet users and the resulting imbalance of bargaining power in internet contracts, "the onus must be on website owners" to adequately notify consumers and obtain their assent in order to bind them to terms. *Id.* at 1179.

Here, the website layouts as demonstrated by PMC's screenshots are similar to that analyzed in *Nguyen*. The only apparent indication of terms and conditions is a very small hyperlink located above the large "Submit" button in Daschbach's case, and above the large

"Continue" button in Person's case. (See Dkts. 12-2, 12-3.) This would be considered a "hybridwrap" presentation of terms and conditions, but there is no admonition or notice to consumers that they must review the terms, as was fatal to notice and assent in *Nguyen*. ); *see also Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018) (affirming denial of motion to compel arbitration where "[e]ven though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention.").

The recent Northern District of California opinion in *Berman v. Freedom Fin. Network, LLC*, is instructive. Considering a similar motion to compel arbitration—which, as is the case here, featured a declaration from Mitenkumar Bhadania regarding supposed agreement to arbitrate via Fluent websites, including retailproductzone.com—the Court explained:

> In essence, "the onus [is] on website owners to put users on notice of the terms to which they wish to bind consumers." *Nguyen*, 763 F.3d at 1178–79. "Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id.* at 1179.

> Here, defendants have failed to meet their burden to establish that plaintiffs Hernandez and Russell entered into an agreement for mandatory arbitration. As a preliminary matter, an evidentiary dispute exists as to whether the webpage screenshots offered by defendants in support of their motion evidenced an agreement with either plaintiff. Defendants based their motion on a declaration of Mitenkumar Bhadania, a computer system engineer for Fluent, submitted January 22, 2020. (Dkt. No. 224-1.) Bhadania very generally explains how he "recreated" the set of multiple webpages each plaintiff would have seen when they visited the websites based on a unique visitor ID generated for each session, and "regenerated images" of the webpages.[2] The exhibits submitted by Bhadania are the equivalent of blank form contracts, with no clear indication that these plaintiffs agreed to them. (*Id.* at Exh. 1, 4.) Fluent elected to omit other pages from the multiple page "flow" for these website visits which might have demonstrated that these particular users interacted with these particular pages. (*Compare id. with* Bhadania Decl. submitted July 31, 2020, Dkt. No. 260-4, Exh. 1, 3 [including images of checked boxes, additional identifying information, and a system timestamp image].) Given that

plaintiffs each submit declarations disputing seeing elements of these pages, and defendants failed to provide complete information to authenticate the exhibits, the Court finds that there are material facts in dispute.[3]

Even if there were no dispute that the proffered webpages caused these plaintiffs' phone numbers to be recorded as leads for Fluent, the webpages do not conspicuously indicate to users that they are agreeing to the Terms and Conditions, including an agreement to mandatory arbitration. The webpages at Exhibits 1 and 3 to the Bhadania declaration do not include a specific affirmative means of indicating consent to the Terms & Conditions or arbitration clause.[4] (*See* Appendix A to this Order.) Similar to the website at issue in *Nguyen*, while there is text including a hyperlink to the terms of the agreement located near a button the user must click to continue, there is no text that notifies users that they will be deemed to have agreed to these terms "nor prompts them to take any affirmative action to demonstrate assent." *Nguyen*, 763 F.3d at 1179. *Nguyen*, 763 F.3d at 1178-79. There is no tickbox or "I agree" button for the Terms & Conditions. As in *Nguyen*, the hyperlink to them is only located in proximity to button with which the user must interact to continue. The "This is correct, Continue!" and "Continue" buttons plainly refer to the entry of other information on the page, not assent to the Terms & Conditions. (*See* Appendix A ["Confirm your ZIP Code Below" and "Complete your shipping information to continue towards your reward"].) Although the user must interact with the page and click a button to continue using it, that click is completely divorced from an expression of assent to the Terms & Conditions or to mandatory arbitration. Further, the phrase "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" is formatted in black font against a white background which is exceedingly small compared to the larger, more colorful and high-contrast fonts on the rest of the page, making it difficult to read on a large, high-resolution monitor, much less a mobile device. (*Id.*) That the very small text providing the hyperlink to the Terms & Conditions also uses the words "which includes mandatory arbitration" does not change the analysis since the website does not prompt affirmative assent to this statement.[5]

For the foregoing reasons, the Court finds that defendants have failed to meet their burden to establish assent to the mandatory arbitration agreement in their Terms & Conditions as to plaintiffs Hernandez and Russell. The motion to compel arbitration is **Denied** on those grounds.

*Berman v. Freedom Fin. Network, LLC*, No. 18-CV-01060-YGR, 2020 WL 5210912, at \*3-\*4

(N.D. Cal. Sept. 1, 2020).

In short, as was the case in *Berman*, Plaintiffs were not provided with adequate notice of

the hybridwrap terms, including the mandatory arbitration clause. Without adequate notice,

Plaintiff could not and did not manifest assent to those term, and there is no enforceable

agreement to arbitrate. Accordingly, Defendant's Motion should be denied.

## 2.      Plaintiffs Deny Visiting These Websites

As explained above, even if what PMC says is true and Plaintiffs went to these websites,

there is no enforceable agreement to arbitrate. However, "parties cannot be forced to submit to

arbitration if they have not agreed to do so," and Plaintiffs deny visiting these websites.

*Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 785 (11th Cir.

2008).

When considering whether the parties agreed to arbitrate, courts apply a summary-

judgment like standard, as an order compelling arbitration is effectively a "summary disposition

of the issue of where or not there ha[s] been a meeting of the minds on the agreement to

arbitrate." *Id.* (alterations in original); *see also In re Checking Account Overdraft Litig.*, 754 F.3d

1290, 1294 (11th Cir. 2014); *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774

(3d Cir. 2013) (holding that a motion to compel arbitration should be judged under the Rule 56

standard when the movant has facially established arbitrability but the non-movant has raised its

own evidence to place the question at issue). A district court considering the making of an

agreement to arbitrate "should give to the [party denying the agreement] the benefit of all

reasonable doubts and inferences that may arise." *Magnolia*, 272 Fed. Appx. at 786 (citing *Par-*

*Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). In other words,

when opposing parties "tell two different stories," the Court must "accept the non-movant's

version of events unless it 'is blatantly contracted by the record.'" *Richardson v. Verde Energy*

*USA, Inc.*, 354 F. Supp. 639, 652–53 (E.D. Pa. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380

(2007)).

Here, both Plaintiffs and Defendant have supported their positions with testimonial evidence. PMC has provided the Bhadania Declarations. Conversely, Plaintiffs provide their own declaration, testifying that they never visited the websites and never authorized anyone else to do so. (Exs. A and B.) Indeed, both Plaintiffs provide additional testimony that cast doubt on PMC's claims. Daschbach is over 80 years old, graduated with a law degree from Georgetown in the 1960s, and had a distinguished legal career, including serving as the Chief Judge of the Federal Employees Compensation Appeals Board, yet PMC claims he was surfing the internet looking for a job on a website called finddreamjobs.com. (*See* Ex. A.) Moreover, Person claims he rarely uses the internet whatsoever, only has one device that is capable of connecting to the internet (his cellphone), and never uses that device to access the internet, yet supposedly visited an obscure website called retailproductzone.com. (*See* Ex. B.)

The declaratory evidence before the Court tells two different stories as to whether Plaintiffs agreed to arbitrate their claims, but the underlying accounts are not contradictory—the fact that PMC obtained Plaintiffs' information from this particular lead generator (Fluent) does not guarantee that either Plaintiff visited the websites and entered the information as Fluent claims. As mentioned above while discussing the *Berman* case, this is not Fluent's first rodeo. Other courts have found comparable declarations to those submitted by Plaintiffs here to counter affidavits that were not only similar to Defendant's, but *submitted on behalf of the same Fluent, LLC employee*. For example, the Northern District of California in *Berman* (in an opinion earlier in the case than the more recent one discussed in detail above) found that the plaintiff's sworn denial that he did not visit the subject lead generation website was enough to create a factual dispute as to whether Berman consented to the terms and conditions containing an arbitration clause. *Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060-DMR, 2018 WL 2865561, at

*4 (N.D. Cal. June 11, 2018). Ultimately the court denied the defendant's motion to compel arbitration, "[i]n light of Berman's numerous and unequivocal denials, *and resolving all reasonable doubts in Berman's favor*." *Id.* at *4 (emphasis added).

In another instance, a plaintiff in the Eastern District of Pennsylvania made a similar denial that he had visited a website, even though his personal information did match what the defendant provided. *Richardson v. Verde Energy USA, Inc.*, 354 F. Supp. 3d 639, 652–53 (E.D. Pa. 2018). Considering a motion for summary judgment on the issue of consent to be called, the court found that the statements in Bhadania's declaration were consistent with both the defendant's theory that Richardson submitted the consent form and Richardson's theory that "a different person (or algorithm or 'bot') in possession of his contact information filled out the online registration." *Id.* at 652 (internal quotations omitted). The tipping point, of course, was that the court "must accept the non-movant's version of events," which were not blatantly contracted by the Bhadania declaration submitted in that action. *Id.* at 652–53.

While Plaintiffs do not yet have enough information to theorize exactly how Fluent obtained their information, their testimony can be reconciled with the Bhadania affidavit in a way that highlights the insufficiency of Defendant's evidence to establish agreements to arbitrate. In another similar case, the court noted that "online 'opt-in' forms present a unique risk in which data may pertain to a particular consumer, but ultimately may have been actually obtained through sources other than the consumer." *McCurley v. Royal Seas Cruises, Inc.*, No. 17-cv-00986-BAS-AGS, 2019 WL 1383804, at *26 (S.D. Cal. Mar. 27, 2019).

In sum, PMC has not provided sufficient evidence to prove that Plaintiffs entered into an agreement to arbitrate their claims against Defendant. Plaintiffs denies visiting the lead generation website, and their denials do not contradict the evidence before the Court. As the

nonmoving party, Plaintiff is entitled to a construction of the facts in their favor, and

Defendant's Motion to Compel should therefore be denied.

> **B.      Defendant's Alternative Request For Dismissal For Lack of Jurisdiction Fails.**

As a backup argument, Defendant contends that the Court lacks jurisdiction. (Dkt. 12-1,

10-15.) As explained below, Defendant again misses the mark.

Allegations of jurisdictional facts are construed in the plaintiff's favor, *see Buckley v.*

*Bourdon,* 682 F.Supp. 95, 98 (D.N.H. 1988), and, if the court proceeds based upon the written

submissions of the parties without an evidentiary hearing, the plaintiff need only make a *prima*

*facie* showing that jurisdiction exists. *See Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 674–75

(1st Cir.1992).

*"*Before a court may exercise personal jurisdiction over a non-resident defendant, the

plaintiff must show, first, that the forum state's long-arm statute confers jurisdiction over the

defendant, and second, that the exercise of jurisdiction comports with constitutional due process

standards (by establishing that the defendant has sufficient "minimum contacts" with the forum

state)". *D'Jamoos v. Atlas Aircraft Ctr., Inc.*, 669 F. Supp. 2d 167, 169–70 (D.N.H. 2009).

(citations omitted). "New Hampshire's corporate long-arm statute, RSA 293–A:15.10, authorizes

jurisdiction over foreign corporations and unregistered professional associations to the full extent

permitted by federal law. *Id.* (citations omitted). *"*Stated another way, New Hampshire's . . .

corporate long-arm statute[] reach as far as the due process protection afforded by the federal

constitution will allow." *Id.*  "Accordingly, the court need only determine whether the exercise

of personal jurisdiction over a foreign defendant would comport with federal constitutional

guarantees." *Id.*

To exercise personal jurisdiction over a foreign defendant in a manner consistent with the Constitution, the plaintiff must demonstrate that the defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

The First Circuit has established a three-part test for specific personal jurisdiction: (1) the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities; (2) the defendant's instate contact must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of the state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) the exercise of jurisdiction must be reasonable. *See United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992). Unlike general jurisdiction, "even a single act can support [specific] jurisdiction" as long as it creates a substantial connection with the forum. *Burger King*, 471 U.S. at 475 n. 18 (citing *McGee v. Int'l Life Insurance Co.*, 355 U.S. 220, 223 (1957)). The defendant's conduct and connection with the forum state must be such that it should reasonably anticipate being haled into court therein. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). A corporate defendant that purposely avails itself of the privilege of conducting business in the forum state has "clear notice" that it may be sued there. *Id.*

This case plainly falls within these parameters. PMC directed its telemarketing activities to New Hampshire when it called Daschbach. By placing telemarketing calls to New Hampshire residents in an attempt to sell its auto warranties, PMC has purposely directed its sales activities to the forum state of New Hampshire. PMC has therefore availed itself of the privileges of

conducting business in New Hampshire, and thus it has clear notice that it is subjected to suit in this forum. Indeed, PMC's telemarketing campaign created a substantial connection to New Hampshire, which, though perhaps insufficient to confer general jurisdiction over PMC, supports the Court's exercise of specific, personal jurisdiction over PMC, as it should reasonably anticipate being haled into this Court. *See Weiss v. Grand Campus Living, Inc.*, No. 118CV00434JRSTAB, 2019 WL 1206167, at *3 (S.D. Ind. Mar. 14, 2019) (finding specific personal jurisdiction over a defendant who texted Indiana cell phone numbers and noting that "[a]lthough a text message would be a thin reed to lean on for personal jurisdiction in a typical breach-of-contract matter, it constitutes purposeful direction in this TCPA suit, where the text messages are themselves the gravamen of the complaint."); *see also D'Jamoos*, 669 F. Supp. 2d at 173 ("the court of appeals has noted that a state has a 'demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders.' [and has] 'repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience.').

Thus, the Court has specific personal jurisdiction over this case. The fact that Person resides outside of the State of New Hampshire is of no consequence. As Judge McAuliffe explained in *D'Jamoos*:

> Professors Wright and Miller summarized the doctrine of pendent personal jurisdiction as follows:
>
> [T]he pendent personal jurisdiction doctrine in both the diversity and federal question contexts is best articulated as follows: a district court has discretion to exercise personal jurisdiction over a claim that it ordinarily lacks personal jurisdiction over only when that claim arises out of the same common nucleus of operative fact as does a claim that is within the in personam jurisdiction power of the court ... Under this description of the doctrine, a district court may not reach beyond the forum state's long-arm statute merely because doing so would promote efficiency. The court first must find that the additional claim is within the same

common nucleus of operative fact as a claim that already falls within the ambit of the forum state's long-arm statute.

4A C.A. Wright & M.K. Miller, *Federal Practice and Procedure* § 1069.7 (2d ed.1995).

In the exercise of its discretion, the court concludes that it is appropriate to apply that doctrine in this case. Because both of plaintiffs' claims against Pilatus arise out of the same common nucleus of operative fact, the court may properly exercise personal jurisdiction over Pilatus as to the Defective Aircraft Claim. Both claims— the Defective Aircraft Claim and the Service Manuals Claim—arise from the crash of the Pilatus aircraft in Pennsylvania. By virtue of having personal jurisdiction over Pilatus with regard to the Service Manuals Claim, the court may properly exercise personal jurisdiction over Pilatus as to any remaining related claims.

*D'Jamoos*, 669 F. Supp. 2d at 174–75.

Finally, PMC's arguments that *Bristol-Myers* strips this Court of jurisdiction over absent class members also misses the mark. The personal jurisdiction rule relating to non-resident plaintiffs discussed in *Bristol-Myers*, a mass-tort action originally filed in California state court that named both resident and non-resident plaintiffs, simply does not apply in the class action context.[1]

This is because "[i]n a mass tort action, like the one in *Bristol-Myers*, each plaintiff is a real party in interest to the complaints, meaning that they were named as plaintiffs in the complaints. By contrast, in a putative class action, one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the 'named plaintiffs' are the only plaintiffs actually named in the complaint." *Tickling Keys, Inc. v. Transam. Fin. Advisors, Inc.*, 305 F. Supp. 3d 1342 (M.D. Fla. Apr. 3, 2018). Unlike the state court mass tort plaintiffs in *Bristol-Myers*, "the

---

[1] Indeed, the Supreme Court in *Bristol-Myers* expressly stated that its "decision concerns the due process limits on the exercise of specific jurisdiction by a State" so "the question remains open whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1777, 198 L. Ed. 2d 395 (2017)

party seeking to maintain a class action [in federal court] must satisfy the due process safeguards

contained in Federal Rule of Civil Procedure 23." *Feldman v. BRP United States, Inc.*, 2018 U.S.

Dist. LEXIS 53298, at *15 (S.D. Fla. Mar. 28, 2018). Accordingly, in a federal court class action

"courts are concerned only with the jurisdictional obligations of the named plaintiffs." *Chernus*

*v. Logitech, Inc.*, 2018 U.S. Dist. LEXIS 70784, at *19-20 (D.N.J. Apr. 27, 2018); *see also*

*Molock v. Whole Foods Mkt., Inc.*, 297 F.Supp.3d 114, 126–27 (D.D.C. 2018) ("These additional

elements of a class action supply due process safeguards not applicable in the mass tort context.

In light of these key distinctions ... the court joins the other courts that have concluded that

*Bristol–Myers* does not require a court to assess personal jurisdiction with regard to all non-

resident putative class members.").

 Applied here, personal jurisdiction over PMC with respect to the pleaded nationwide

classes' claims turns on the Court's personal jurisdiction over PMC in connection with Plaintiffs'

claims. Accordingly, because the Court has jurisdiction over Defendant as to Plaintiffs' TCPA

claims, the Court also has jurisdiction over Defendant as to the putative classes' TCPA claims.

 The Court should therefore reject PMC's *Bristol-Myers* arguments, as courts throughout

the country have done. *See, e.g., Becker v. HBN Media, Inc.*, 314 F. Supp. 3d 1342 (S.D. Fla.

June 6, 2018) ("*Bristol-Myers* does not apply to class actions"); *see also Chernus*, 2018 U.S.

Dist. LEXIS 70784 (D.N.J. Apr. 27, 2018) ("courts are concerned only with the jurisdictional

obligations of the named plaintiffs"); *see also Tickling Keys*, 2018 U.S. Dist. LEXIS 79578,

(M.D. Fla. April 4, 2018) ("the Court declines to extend Bristol-Myers to the class action

context"); *see also In re Morning Song Bird Food Litig.*, 2018 U.S. Dist. LEXIS 44825 (S.D.

Cal. Mar. 19, 2018) ("claims of unnamed class members are irrelevant to the question of specific

jurisdiction"); *see also Casso's Wellness Store & Gym LLC v. Spectrum Lab Prods., Inc.*, 2018

U.S. Dist. LEXIS 43974 (E.D. La. Mar. 19, 2018) ("material differences between mass tort actions and class actions further support the finding that Bristol-Myers is inapplicable to the instant case, a purported class action invoking federal question subject matter jurisdiction"); *see also Molock v. Whole Foods Market, Inc.*, 2018 U.S. Dist. LEXIS 42582 (D.D.C. Mar. 15, 2018) ("These additional [Rule 23] elements of a class action supply due process safeguards not applicable in the mass tort context."*); see also Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360 (N.D. Ga. Jan 26, 2018) ("in contrast to a mass action like Bristol-Myers, which may—and likely would—present significant variations in the plaintiffs' claims, the requirements of Rule 23 class certification ensure that the defendant is presented with a unitary, coherent claim to which it need respond only with a unitary, coherent defense"); *see also In re Chinese-Manufactured Dry Wall Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 197612 (E.D. La. Nov. 30, 2017) ("a class action has different due process safeguards"); *see also Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 2017 U.S. Dist. LEXIS 155654 (N.D. Cal. Sept. 22, 2017) ("*Bristol-Myers* is meaningfully distinguishable based on that case concerning a mass tort action").

Simply put, the Court has personal jurisdiction over PMC for all members of the pleaded nationwide classes and PMC's Motion should be denied.

## IV.    CONCLUSION

Each of Defendant's arguments for dismissal falls apart. Plaintiff respectfully requests that the Court deny Defendant's Motion, allow the case to proceed to discovery, and award such additional relief as the Court deems necessary, reasonable, and just.

**RICHARD DASCHBACH AND
ELCINDA PERSON**, individually and on
behalf of all others similarly situated,

Dated: September 29, 2020                         By: /s/ Patrick H. Peluso

One of Plaintiff's Attorney

Patrick H. Peluso*
ppeluso@woodrowpeluso.com
Taylor T. Smith*
tsmith@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Ave., Ste. 300
Denver, CO 80210
Tel: 720-213-0675
Fax: 303-927-0809

V. Richards Ward, Jr.
39 N. Main St., Unit D-3
PO Box 1117
Wolfeboro, NH 03894
Tel: 603-569-9222
Fax: 603-569-9022
Email: rick@vrwardlaw.com

*Attorneys for Plaintiff and the Alleged
Classes*

*pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2020 I caused the above and foregoing papers to be served on all counsel of record by filing such papers with the Court using the Court's electronic filing system.

/s/ Patrick H. Peluso